Good morning, Your Honors. Seth Atensasser, Bernstein Liebhardt on behalf of Plaintiff or Appellant, Catoosa Fund LP. We are here for a review, a de novo review of the dismissal of our securities fraud litigation involving a company called Medivation. And we lost at the court below based on falsity and scienter. The court felt we hadn't adequately pledged either. This case, though, in my view does meet falsity and scienter. It has very unique factors that make it different than a typical garden variety securities fraud lawsuit that appear in the Ninth Circuit and district courts in the circuits. The allegations concern a Russian antihistamine that was supposedly could be the cure for Alzheimer's. Medivation purchased the rights to Imabond, which was the Russian antihistamine, did testing, which was done primarily and entirely in Russia, and in 2006 announced that this was the greatest drug ever based on the results for Alzheimer's. There were statistical endpoints that were met. It not only met some of the statistical endpoints, it met all five of the statistical endpoints. This was utilized for Phase II testing for FDA approval. One-third of the drugs that are tested for Phase II don't make it through that phase. And if you do make it through Phase II, the drugs on a 90 percent basis make it through Phase III. After the announcement in 2006 that this was a great drug, the stock price went up dramatically, I think 40 percent on the day of the announcement. And then in 2010, the company announced Phase III results. They were terrible. It did zero. It was just as bad as the placebo. The stock price resulted in a 60 percent drop that day from $40 a share to $13 a share, and the company held a press conference, couldn't explain the results. We were appointed lead counsel in the case. Our client, Hedge Fund, was appointed lead plaintiff in the case, and we went off to investigate what happened, why was there such a disparity between the greatest results ever on Alzheimer's drugs, all statistical endpoints being hit, versus zero in Phase III. We came across Dr. Lon Schneider from USC Medical School. He's a leading psychiatric professor. He also is involved with Alzheimer's trials across the country, and he told us right off the bat, I know what the problem is. The problem is they didn't match the pills and placebos for the Phase II testing in Russia. And what did he base that immediate opinion? So he had based it on a number of things. He told us off the bat, and mind you, he's not a confidential witness. He's foremost in our complaint. He verified the allegations about him, and he was comfortable with them. He said a couple of things. When he read the was co-authored by Defendants Hung and Seeley, he noticed right away that while the Lancet said the pills were matched, it didn't describe the appearance, the size, the color, who had manufactured it. He compared that to another study of Dimabon, the same drug that was being done for Huntington's. They were looking at the drug for Alzheimer's in Huntington's, and there, the Huntington paper contained who manufactured it, the fact that it was encapsulated to mask the taste, and that's very important because Dimabon had a very bitter taste. It was an antihistamine. So as soon as it hits the tongue, you feel that it's an antihistamine. It's taking Allegra or any of these other drugs that we have in the U.S. So he said, first of all, he found the language very disconcerting in the Lancet. He also said that he had a colleague who went to a medical conference days after the failure of Phase II, and a question was asked to Defendants Hung and Seeley whether or not the pills and placebos were identical, and they said they weren't. This was for the Phase II study. This was reported to us also by Lon Schneider. Is that a – is that – is any of that good here? I mean, how does that satisfy the pleading standard when it's just clearly hearsay? Well, first of all, I do believe that hearsay can suffice to meet the pleading standard. Hearsay is not excluded. What evidence would you then come up with at trial? Well, let's continue from there. We did not get through the motion that was dismissed based on what Lon Schneider said. The district court said, I don't think this is reliable enough. So we then directed our investigation to Russia itself, and we knew it would be difficult. We knew it would be hard. We hired investigators who operate out of the U.S. and out of Russia. They were able to identify the manufacturer of the Dimabon in Russia. That was a company called Organica. The investigators went and made contact with what we call CW2, who was a – who was a current director and a shareholder of Organica. Yeah, but his – but CW2 has got – has figured all of this out after consultations with CW1. So CW2 is not talking about any information that he holds – that he possesses, but only what somebody else told him. So we've got the same hearsay problem if we go to CW2. Right. But I think given the circumstance of this case, we're talking about Siberia. I don't speak Russian. The concept of going and investigating a company – and mind you, this isn't Medivation that's being investigated. It's a third party that's being investigated. I think that's a big difference between Zucco and Dow and a lot of these cases. We're not talking about an investigation of Medivation. We're going to Siberia. It's a source of the pills, because the allegations were that the pills were – Right, but it seems like it would have been pretty – pretty easy to get somebody who would say, yeah, I'm familiar with the process by which we did this. The pills were – the we didn't get them candy-coated or whatever it is that we – that we coated them so that they were identical in taste, and that was a failing on our part. But CW3 said – CW3 comes in and says, I was there at the time the placebos and pills were – I don't even see in your complaint in paragraph 30 that CW – that CW3 says that he tested these pills. It says that he's an organic employee responsible for testing and introducing new medicines. It doesn't say anyplace. Well, I'm looking at paragraph 70. And it says he occupied that position when Dimabon was tested, but it didn't say that he tested Dimabon. I understand that, but we got information. It's put – it's put in passive voice, and passive voice has a way of sort of disguising certain kinds of responsibility. Our understanding, based on our investigation, was that CW3 had an understanding of these pills, because CW3 was at the time the pills and placebos were being manufactured and utilized for phase two. And this is the testimony of CW3 saying the pills and placebos did not match. They were different in color. One had sugar in it. One was bitter. So the concept, again – and I'll stress the unique nature of this case – the fact that we were able to get to Siberia, speak to someone within Organico who had this information, who was there at the time, I think is very helpful. I mean, you don't have to be the CEO of a company to have bad information. If you worked within the CEO's office or you worked somewhere else in the company, you may have the same information. We're not taking someone who worked at a – I agree. We may get much more reliable information from people who aren't CEOs here. Right. The question is whether you have – whether you have even adequately pled that CW3 is a witness who's got direct – who's got direct knowledge of what went on. Right. And we believe that CW3 does give that information because the allegation is that employee was at Organico at the time. And that employee isn't saying, I heard from someone else. That employee is saying these are the facts as they existed at that time. We were very careful when we pled our complaints. When we talked about CW1 reporting to CW2, we also implied there that our investigators had actually heard that information. When it came from CW3 talking to CW2, that comes from CW2. Now, let's talk about that for a second. There's cases cited where a director may not have information. Let me make sure I understand what you're saying, counsel. So paragraph 70, so you said CW3 recently informed the Organico board, CW2 that. This information, all of the five – the four bullets that follow came from CW2 saying CW3 told me this. That's correct. So it's again hearsay. Again, but let me say it one more time, Your Honors. This isn't a situation where a director of a company knows information. CW2 was actively helping us in our investigation by trying to get to the bottom of what happened here. CW2, and let's talk about hearsay, made an admission against interest here. He's saying something that Organico did that may not be in Organico's best interest. So if there's an exception to the hearsay rule, obviously an admission against interest would be there. So CW2, who is actively helping us in going forward and getting this information, is not doing Organico any favors because I'm sure this isn't information that Medivation wanted out there in the public domain. So under the context of this case where we're doing an investigation in Russia, we don't speak the language, we're 7,000 miles away from Siberia, we're doing the best we can to get information, which corroborates what Dr. Schneider said, which shows why there's such a disparity. How could it be such an amazing drug on one hand and do absolutely zero without something being wrong with the data, without something being wrong with the results? This is what happened in this case. We've alleged it through Dr. Schneider, we've corroborated it through the CWs, and at this point we have raised what we believe are reasonable facts to pass through the PSLRA on falsely because the company said time and time again we used matching pills and placebos, and we believe that we've pled that. We also lost on Sienter, which I think is looked at hand-in-hand with falsity. But to that end, in terms of Sienter, we allege that Hung and Seeley, two defendants, helped write the Lancet paper. They claimed the pills were matched. They wouldn't have written or co-authored or been involved in the study and said that had they not looked at the pills. If the pills weren't matched, that would be an extreme departure from urinary care. We're dealing with Alzheimer's patients here. One of the things that Dr. Lon Schneider was so upset, and mind you, he consulted for medivation, he consulted for Pfizer in the past, a co-venture here, and other Alzheimer's trials, was he was very upset that this got the attention that it did, and that all Alzheimer's patients got their hopes up for something where it's unclear how it would even work based on the science. Medivation wouldn't give the Dimabon pills to anyone else to test and utilize. But we're talking here a situation where it's a very, in my view, tight and well-pled story, along with the motive of selling $22 million worth of stock, none of which stock was sold before Phase 2 was announced, and some of the stock was sold before the announcement of Phase 3. Counsel, we have an additional problem with CW3, because you've pledged in your second amended complaint that CW3 said something different than what he said here. CW1 had said something different in the second amended complaint versus the third. The problem was, after we lost at the motion to dismiss stage, we engaged our investigators, went through CW2. CW2 met or spoke to CW1. CW1 said, we did the Dimabon pills. They were bitter, but we did not make a matching placebo. We amended our complaint to add that information. After that complaint went in, we got another contact from our investigators who said, CW2 has dug deeper. We have more information now. He met with CW3, who was there at the time, who had more information about it, and that's why we filed a third amended complaint. We didn't rest on the allegations with CW1 and won an adjudication on that. We did what we thought was a responsible move, where we amended our complaint to bring the court up to date with all the information we had, CW3 having more information than CW1. Now, I know in the annals of these cases, this doesn't happen often. This doesn't look so great. But usually cases don't involve investigations in Siberia, where we're trying to get to the bottom line of what happened. Let me just add one more thing. I've read the Zucco case. I've read the Dow case and others. Those cases deal, Zucco in particular, not with falsity, but with scienter. The CWs were being utilized to see how high up the scienter went. Here, this is akin to an accounting restatement case, where if you want to look at scienter and materiality, you look at the size and magnitude of the restatement. Here, the size and disparity of the failure between the Phase II and Phase III is enormous. So if you want to look at scienter and falsity, I think we have to look at that as a factor as well. And, Your Honor, I know we have a minute and a half left. I'd like to reserve unless you have a question. Okay. Good morning. May it please the Court. I'm John Dwyer on behalf of the defendants, Medivation, Drs. Seeley and Hung, and Mr. Machado. I'd like to start where plaintiff's counsel actually started with regard to this figure about 90 percent of drug trials that get to Phase III ultimately have successful Phase III trials. As an initial point, they've been asserting that statistic throughout the entire length of this litigation. And we have continually said that's an allegation based upon information and belief. And under the PSLRA, you have an obligation to set forward what the basis is of your allegation on information and belief. They never set forth what their basis was until the reply brief before this Court. And in footnote 11 on page 21 of their reply brief, for the first time they cite two articles. I'd like to make two brief points. First, they have failed under the PSLRA to adequately plead in the Third Amendment complaint itself what the basis of this 90 percent number is. But secondly and most importantly, if the Court looks at those articles, and I have copies of that I'm happy to leave with the clerk if the Court would find that helpful, you will find that those articles don't support that statistic in any way. I'm sure it struck all of you kind of as a surprise that 90 percent of the trials, the drugs are successful in Phase III. In fact, what that article says, there's two articles. The first article says that if a drug is successful in Phase II, approximately 55 percent of the time does it get through Phase III and a new drug application is filed. And then it says if you get through Phase III and you file a new drug application, 80 percent of those are ultimately approved by the FDA. So that 80 percent had to do with a drug that had a successful Phase III and ultimately got approval by the FDA. The second article says on average over the last 10 years, I think it was 10 years, that drugs that are successful in Phase II, about 50 percent of the time do they have success in Phase III. So the allegation that he started with the 90 percent is just absolutely factually untrue. And to this point, I think it's fair to say that it's not true. And I think it's fair to say that the allegation in Paragraph 43 disagrees with what you just said. And isn't that a question of fact or at least expert opinion that would have to be examined before you could just dismiss it out of hand? It's – I don't think so, Your Honor. Under the PSRA, it makes clear that all allegations and make an allegation. I think there's no question that counsel or plaintiffs do not have personal knowledge of this number. It's clearly an information belief. On that basis alone, I think the court should reject it. And I think under the PSLRA it needs to reject it. But if you want to look at it, it turns out it's just not true. So they fail to allege with particularity what they relied upon. And then when they finally do in a footnote 21 of the I'd like to turn to the confidential witnesses. They are, I believe, the primary source of their allegations for both falsity and scienter. And I think it's important to look at each of those. But I think you should begin at confidential witness 2, CW2. Basically, he serves as the source for all of the information from the confidential witnesses. CW1 talked to CW2, who then shared it with plaintiff. And CW3 spoke with CW2, who then shared it with plaintiff. We would submit and we argue in our papers that they have failed to adequately plead information about the position this person holds to support the probability that he would possess the information alleged. That's the standard from Zucco. What do we know about CW2? He's a shareholder. He's a member of the board. We don't know when he became a member of the board. There's no allegation on that. Are you on number 2 now? I am on number 2. You skipped number 1. Because I'll come back to number 1, I promise, Your Honor. But the information from number 1 comes through number 2. I think number 2 is one of the least reliable confidential witnesses that I've ever seen. And so I think the problem is that CW2 actually take CW1 and CW3 as well. And the reason for that, Your Honor, is obviously even the plaintiffs acknowledge in their opposition brief, in their brief, that plaintiffs have no, that CW2 has no personal knowledge. So he's simply a conduit for information. And what do we know about him? We know he's a member of the board. We don't know when he became a member of the board or anything else. We don't know what his responsibilities were. But we do know he's unreliable. That's the one, that's the only thing we know about this individual. And why do we know that? Because in the second amended complaint, CW2 said, apparently the plaintiff's counsel, that CW1 came to me and told me that Organica had not produced the placebo. That is, Medivation wanted Organica to produce the placebo and the pill, but he says that Medivation never asked us to produce the pill. The second amended complaint is that Medivation committed fraud by alleging that the same company produced the pills and the placebo. But importantly, what CW2 says is, after CW1 came to me, I verified that. That's the key allegation. He said, I went out and I verified that. And then in the third amended complaint, what does he say? I spoke to CW3. CW3 said, we did provide both the placebo and the drug to Medivation. And the third amended complaint is that CW2 said that, and CW2 said CW3 said that, and he said, I verified that. So all we know about CW2 is he verified X, which was we did not provide the placebo, and he verified not X from CW3 that they did provide the placebo. I would submit, Your Honor, that given that absolute straight contradiction by CW2, that he is unreliable under Zucco and the other cases. The result of that, I believe, is that all of the information that comes out from him, from CW1 and CW2, also has to be rendered unreliable, because he's the source of that information. Now, let me talk about CW1 and CW3 just briefly. CW1 is described as a senior technology engineer at Organica. Unlike in Dow and unlike in Zucco, that's the entire description. There's no description about what he did, a senior technology engineer. There's no description about when he held that position. There's no allegation that he had any involvement with Demobond. There's no allegation that he has any first-hand information about Demobond or really even ever saw a Demobond or the placebo at any time. Kennedy. What is this allegation? I haven't quite got my hand on it, but confidential witness 1 made statements in Second Amendment complaint, which were then in the Third Amendment complaint. And he was avowed. Right. So in the Second Amendment complaint, plaintiff asserts that CW1 said two things. One, we did not, we, Organica, provided the Demobond drug for the Phase 2 trial, but we did not provide the placebo. Yeah. And then also, the Demobond drug that we provided tasted, it numbed your cup, basically is what he said. And that's the Second Amendment complaint. In the Third Amendment complaint, they delete the first allegation completely where he says we did not provide the placebo. They just cross it out. It disappears. And CW3 now says affirmatively, we, we provided both the placebo and the drug for the trial. And interestingly, what CW3 says, Your Honor, is that we tried to match the, they say we tried to match the placebo and the drug, but we were unable to do it. I actually think that fact coming from CW3 undercuts any inference of Scienture, because although it's not said, I think a reasonable inference is that if Organica actually provided the placebo and the drug, and they tried to match it, I think the reasonable inference is that Medivation, when they ordered those drugs from Organica, asked them to provide matching placebo and matching drug. And at no point is there any allegation from CW3, who I think is suspect in other ways, but there's no allegation from CW3 or anyone else that there was ever a communication to Medivation or to anyone at Medivation that they had trouble matching the placebo and the drug. Does that clarify the confusion between CW1 and CW3? Ultimately, CW3 is, I think, equally unreliable. CW3 says that, again, we don't know at what time they were employed, CW3. CW3 claims to have no direct knowledge or involvement in any way with regard to Demavon. And what he says is he was a longtime employee. Respond. I'm sorry. We do know when he was employed. Unlike the other CWs, he's a longtime employee who was responsible for testing and introducing new medicines and occupied that position when Demavon was tested. And the district court found the word new there to be important because this wasn't a new medicine to Organica, but it was a new medicine to Medivation, and it was a new So if you're supposed to draw inferences in favor of the pleader, at least to the extent that it's not inconsistent with inferences you draw in the defense, why isn't that enough to at least describe who CW3 is and why he had the information? So, Your Honor, I agree with the analysis with regard to falsity. With regard to Scienter, I think the Court's actually obligated to draw inferences in different ways and see what the most compelling inference ultimately is. But with regard to that issue, from that, I don't know if that means that he was employed at Organica in 1983, which is when Demavon was a new drug and it was just being approved as an antihistamine in Russia, or if he means that he was employed in 2004 when Medivation ordered the drug. But then on top of that, Your Honor, he says he's responsible for testing and introducing new medicines. As the lower court, as you properly identified, the lower court was troubled by that. But then in the oral argument, the plaintiff's counsel said, well, we're not really sure what his job was. And then in their opening brief at page 38, note 17, plaintiff says, there could be words that are misplaced, such as the testing of new medication. It might have been testing of medication for outside parties. If the party sponsoring the confidential witness doesn't even know what that confidential witness allegedly did when he or she was at Organica, I don't know how the Court can find that ultimately credible. The other thing, I always look at these very carefully, and I'm sure plaintiff carefully crafted the allegations around each of these CWs. There's no allegation in the complaint at all, and it could have easily been said that he said, hey, I'm responsible for testing new medicines, and I was involved in testing Demavon as an Alzheimer's drug, as an Alzheimer's disease drug. They could have said that. It's a very carefully crafted allegation with regard to CW3. I next would like to talk briefly about Dr. Snyder. Again, because I do think plaintiff relies primarily on the confidential witnesses and then Dr. Snyder. Dr. Snyder, to be clear, had no personal knowledge of any of the underlying facts. But experts ordinarily don't. They're allowed to give opinions based on non-admissible evidence, correct, hearsay, as long as that as long as the facts on which they base their opinion are the types of facts that experts usually in that field rely on, and that's usually the subject of a Daubert motion or something like it. Was there any type of proceeding like that in this case? No, there wasn't. This was on a motion to dismiss under the PSLRA with the Heinem pleading standards under the PSLRA. But in plaintiff's brief on page 16, what they describe Dr. Snyder is doing is he reviewed plaintiff's evidence, and he concluded that the Phase II study was not blinded. Well, I would submit that's the role of the district court and ultimately this Court. All Dr. Snyder did is sit down and he looked at the evidence and he said, in essence, I think you should be able to get a motion to dismiss. That's how they're using him. And it's this Court's obligation, as it was the obligation of the district court, to look at those allegations. And he never says he saw a demo bond. He never says that he had any involvement in any of the trials. He didn't. What did he do? He did two things. One, he says he looked at this Lancet article and he didn't like the description. There should have been more detail in the description. Well, the Lancet article does say the placebo and the drug were matched. He just thinks they should have used the language identical and talked about the size, et cetera. You know, the Lancet is one of the three leading medical journals in the United States. It's peer-reviewed. It went through that process. The Lancet seemed comfortable with the description. And the eight authors of the article, two of them, admittedly, were Dr. Hung and Dr. Seeley, who are defendants in this case. But there were six others who were involved in authoring that. And they also seemed to feel comfortable that that was an adequate description. The second thing that he relies on is an unnamed colleague who apparently went to a conference on March 8, 2010, in which, Your Honors, I'm over time. Can I finish this thought, 30 seconds? Yes, please. Thank you very much. Who went to this conference in March of 2010, where an analyst asked a question, and Dr. Hung and Dr. Seeley said that the placebo and pill were not identical. Nowhere, and district court was troubled by two things on that. One, why you wouldn't be able to name this colleague who was at the conference, or why you wouldn't be able to name the analyst who allegedly asked the question. He was troubled by the lack of specificity of the district court. And secondly, no analyst, no newspaper article, no one at this conference, later reported that the company had admitted that there was an unblinding of the study. First of all, I don't believe the study was ever unblinded. But from a perspective of looking at the allegations, if, in fact, that bombshell had been dropped at the March 8, 2010, S.G. Catlin conference, I think it would be reasonable to assume that there would have been some analyst who would have identified that, at least the analyst who asked the question. With that, Your Honor, I very much appreciate your time. The district court, the trial court said that the evidence of the doctor was not based on his personal knowledge. If he's an expert, it rarely is. Is that the hanging point of the trial court's determination? No. I think so. First of all, it's a little bit unclear to me, and there's no guidance, I don't think, from this Court about what role an expert can provide in a plea. Yeah. It's supposed to be factual determinations. Right. And what the reasonable inferences are. I guess one could say he's helping us draw reasonable inferences, given his expertise from the evidence that has been alleged. I think the district court was troubled that he had no personal knowledge, but also that the things he relied upon, I think the Court rightly concluded, didn't require any special expertise to draw an inference. That is, he relied upon the fact that some unnamed colleague told him that some unnamed analyst at a conference asked a particular question. He found that lacking in credibility. But he also compared the Lancet article to the description of the pills in the Huntington study, the same pills in the Huntington study, and drew some conclusions. And I'm not saying that he's right or wrong about that. I guess what troubles me a bit is normally that's the type of thing that's tested on a Daubert motion, where the expert gets a chance to say, And then your client would get a chance to put an expert on and say, No, you can't rely on that. It isn't a reliable scientific opinion. And here we're doing it on the face of a pleading. It seems, even with the PSLRA, that seems to be a stretch. I mean, it's clearly under the PSLRA a gatekeeper role for these kind of cases that doesn't apply in all cases. But each of these facts, you know, 0 plus 0 plus 0 can't equal 1, each of these facts, this one's demonstrably false. And if the Court will indulge me, I can demonstrate in 30 seconds, it's demonstrably false. Dr. Seeley says that in the Huntington trials, I'm sorry. So Dr. Schneider said that Dr. Seeley admitted that they used encapsulation in the Huntington trial, and therefore you can infer that there was a problem in the Alzheimer's disease trial. But here's the quote, and this is at ER 494. This is a conference call. I think it's on March 15, 2010, ER 494. And here's what Dr. Seeley says. In the Huntington's trial, the tablets were over-encapsulated. The reason for that was that we had only 10 milligrams of bimbobine at that time. And when we were planning that trial, we were planning to do two different doses of Huntington versus placebo. And so we over-encapsulated the tablets to blind for ghosts. It was to blind for ghosts. So, again, they don't have a right at the pleading stage, Your Honor, to make quotes to take quotes out of context. That's why we have the concept of judicial notice. And when the Court takes judicial notice of that document, you can see it provides no support to Dr. Schneider at all. Huntington's, you had to put it in a capsule because they were masking for ghosts. That's totally different. The Phase II trial was not testing different doses of bimbobine. It was simply placebo and a 20-milligram dose. Thank you. Thank you very much. Thank you. Thank you. Your Honors, Dr. Lonschneider came out and helped us in our case. He didn't mind that his name was out there. He didn't say, I want to be a confidential witness. He put his name and his reputation out there in a public complaint saying, I don't think that these pills were matched. And I don't think they were matched. You know, it's – there – as I was looking through Dr. Schneider's testimony while Mr. Dwyer was talking, there are certain paragraphs here that I think that Dr. Schneider is offering what I would call expert opinion. And I would bet that nobody would dispute what he was saying. For example, paragraph 73, he's describing sort of general procedures that should be conducted in a double blind. And I don't think that anybody would dispute, you know, his expert view as to what was done. Seventy-two is the paragraph you'd look at. But the problem is that Schneider appears to be testifying in the other paragraphs, for example, not on paragraph 73, appears to be testifying as a witness, not as an expert witness, but as an actual witness to what the pills were or were not. Now, he may have some special, you know, knowledge. But, you know, if you put the pills in front of me and I can say, well, this one's clearly lighter than that one, I can tell the difference between those two just by looking at them. It may not take an expert to be able to verify that. So now he's a fact witness. And he doesn't seem to have any basis for that. But he does. He looked at the studies. He saw that in one study they talked about the encapsulation. How can he tell the difference in the color of the pills? And he was told. He was told by a colleague who went to a conference that – But that's hearsay. That means that Schneider cannot testify as to those facts. He can't testify in court at a trial, but he can give information. If I said, Dr. Schneider, I've got two pills here and one of them is lighter than the other, would that make this an appropriate double-blind study? I would love to hear what Schneider says about that. If Schneider says, no, that's not, I will probably take that. But there he's – I have given him – I have given him appropriate facts. That's right. But we took what he said. It wasn't enough. We went to Russia. We didn't craft our allegations specially. We posed it in the complaint as it was told to us. And what I said to oral argument was it's introduced, or CW3 is called, someone in charge of new medicines. I said that was in Russian. For all we know, that could have a different meaning of a title than it would in the U.S. But the information was clear. The pill and placebo weren't matched. They didn't look the same. Paragraph 74, counsel. Dr. Schneider stated that the pills used in Russia in the Phase II trial were provided by the commercial manufacturer of Dimavon. How on earth would Schneider know that? Well, two things. One is he's in the industry. He did work for Medivision in the past. He did work for Pfizer in the past. And he used Alzheimer's. This is based on his information and understanding. Okay. But what's the basis? What's the basis for his information? How does he know that? Your Honor, it's the allegations as are given to us. He says they were uncoded and the bitterness could be tasted. How does Schneider know that they were uncoded? Because this is what everyone in the business was talking about being a problem. Schneider can't be a fact witness here. That's not an expert witness. That's a fact witness. But he can give information which goes to falsity. Well, he doesn't. But he has no – he has no – he has no – if you told him the pills were uncoded, then he could say that's not a double blind. That's not an appropriate industry standard, and I'm very interested in hearing what Schneider has to say. If Schneider says, I know the pills were uncoded, then I want to know how – how do you know that? Because he was told by a colleague.  But that makes – that makes it hearsay, and I don't – I don't know that that satisfies the pleading standard. We need to – we need to hear from the colleague, and we need to know what the – who the colleague was and how he knows that. I understand, Your Honor. And that's why a case like this should go to discovery, and there should be expert testimony, and there should be depositions, and we should be able to decide at summary judgment what happens and how a Phase II study that could be the cure for Alzheimer's turns into nothing more than a breath mint, as it was described. I mean, from the beginning, it's bizarre that an antihistamine used in Russia all these years could be the holy grail for Alzheimer's. Let's call a spade a spade. But when you're told by a company that the Phase II study, which was done under rigorous conditions, comes out with statistical significance, you have to put some weight in that. It turns out the information we got – and you have to look at Dr. Schneider and also the additional information that we were able to get out of Russia about the pill and placebo not being matched. And you're right. CW1 did say something different at first. We didn't rest on that. We went to the court and said we need to amend our complaint because we have new and additional information. CW2 was seeking, as a current board member, to ferret out the information for us. It wasn't done overnight. It took a couple of weeks, and that's what the second amended complaint and the third amended complaint show. And we never got additional information after the third amended complaint was filed, so we rested on this complaint. At that time, I believe that CW3, who was there for a long period of time, including when Dimabon was tested, could give the color, the fact there was sugar in it, the fact that it was bitter. This is information. This is real information that you would look at in Dow and Zucco and Verifone about what was said and where, not just anecdotal information. It's talked about a sugar in the pill, the color, the dark yellow versus the lighter hue. And, Your Honors, I would just submit at this point I think we have pled enough to proceed forward. Okay. Thank you. We thank both counsel for the argument. And with that, the Court has completed the oral argument calendar for the day and for the week, and we stand adjourned.
judges: Gettleman, Wallace, Bybee